FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: _Apr 26 2023_

KEVIN P. WEIMER , Clerk

By: s/Kari Butler

Deputy Clerk

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

In the Matter of the Search of

One black AT&T Flip Phone (unknown phone number)
seized on April 6, 2023 (SUBJECT DEVICE A)

**APPLICATION AND
AFFIDAVIT FOR
SEARCH WARRANT**
Case number: 4:23-mc-35

I, Wayne L. Lloyd, depose and say under penalty of perjury:

I am a Task Force Officer of the Drug Enforcement Administration (DEA) and have reason to believe that in the property described as:

One black AT&T Flip Phone (unknown phone number) seized on April 6, 2023 (SUBJECT DEVICE A), described in Attachment A, incorporated herein by reference,

in the Northern District of Georgia there is now concealed certain property, certain information, and certain data, namely,

See Attachment B, incorporated herein by reference,

which constitutes evidence of a crime, contraband, fruits of crime, or items illegally possessed, and property designed for use, intended for use, or used in committing a crime, concerning violations of Title 21, United States Code, Sections 841, 843(b), and 846, as well as of Title 21, United States Code, Section 924(c). The facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT

Continued on attached sheet made a part hereof.

Sworn to me by telephone pursuant to Federal
Rule of Criminal Procedure 4.1.

_Wayne L. Lloyd_
Signature of Affiant
Wayne L. Lloyd

_April 26, 2023_
Date

Rome, Georgia
City and State

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

_Walter E. Johnson_
Signature of Judicial Officer

AUSA Thomas M. Forsyth III

<u>**AFFIDAVIT FOR SEARCH WARRANTS**</u>
<u>**OF ELECTRONIC DEVICES**</u>

I, Wayne L. Lloyd, a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), depose and say under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.     I am a TFO with the DEA and have been since 2017.  I have been a law enforcement officer since 2000. I am an investigative and law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in 18 U.S.C. § 2516(1).

2.     I am employed by the Polk County Police Department and have been since October 2007. However, I am currently assigned as a TFO to the DEA Atlanta Field Division, Rome Post of Duty (POD) North Georgia HIDTA Task Force. Prior to my assignment as a DEA TFO, I was the Assistant Commander for the Polk County Drug Task Force in Cedartown, Polk County, Georgia. I have been employed in law enforcement for approximately 23 years. For approximately 15 of those years, I have exclusively worked narcotics-related investigations.

3.     Upon being assigned to the DEA as a Task Force Officer, I received one week of specialized TFO training in narcotics investigations and related legal matters, one week of training in money laundering, one week of training in Criminal Interdiction, and three days of training in a course entitled, "Proactive State and Federal Investigations." During my time as a law enforcement officer, I have also received training on the following topics: Basic Narcotics Investigations, Undercover Investigations, Asset Forfeiture Training Money Laundering Course, Gang Investigations, Search Warrants and Affidavits, Interviews and Interrogations, Criminal Procedures, Search and Seizure, Clandestine Laboratory Training, Marijuana Examiners Course, Emergency Narcotics Operations, Criminal Interdiction, Narcotics Commander Workshop, SWAT, Hostage Negotiations, Drug Identification, and the Basic Law Enforcement Training Course.

4.     Prior to and during my assignment with the DEA, I have participated in numerous search warrants resulting in the seizure of illegal drugs (including marijuana, methamphetamine, cocaine, heroin, fentanyl, MDMA, and prohibited pharmaceuticals), drug paraphernalia, drug records, and proceeds of drug trafficking. I have interrogated or interviewed several subjects/defendants involved in drug violations and have participated in several federal and state

inter-agency investigations. I have debriefed numerous defendants, informants, and witnesses who possessed personal knowledge regarding drug trafficking organizations (DTOs). I also have become familiar with and utilized investigative techniques such as electronic and physical surveillance, general questioning of witnesses, the use of search warrants, the use of informants, the use of grand jury subpoenas, the use of pen registers, and the use of undercover agents.

5.      I have conducted physical surveillance, monitored and reviewed recorded conversations of drug traffickers, and corroborated source information. Moreover, I have purchased illegal narcotics in an undercover capacity and during those transactions used "street language" to negotiate with drug traffickers and buyers. Therefore, I am familiar with the jargon and coded language that traffickers use to discuss their drug business on the phone and in person. Through my training and experience, I am familiar with the ways in which drug traffickers use cellular telephones, cellular telephone technology, coded communications or slang during telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

6.      As a Task Force Officer, I have applied for and received judicial authorization to conduct various forms of electronic surveillance, including the

geolocation of target subjects and vehicles, which has assisted in the surveillance of multiple DTOs. I have authored State of Georgia wiretap affidavits and I have authored Federal Title-III affidavits for the Northern District of Georgia. Those wiretaps have successfully assisted in disrupting DTOs operating within the United States.

7.     Through my own experience and the collective experience of others, I have become familiar with how DTOs and drug traffickers operate; specifically, how they conceal, package, smuggle, transport, store, and distribute narcotics. I have become familiar with the tactics DTOs employ to counter law enforcement investigative techniques. I am also familiar with the way drug traffickers use cellular phones and other electronic devices to facilitate their illicit activities.

8.     Moreover, I am familiar with the ways in which drug traffickers collect, conceal, convert, transmit, transport, and launder their drug proceeds, including (without limitation) the use of couriers to transport currency and proceeds, the use of third parties and nominees to purchase or to hold title to assets, the use of multiple vehicles as conveyances for drugs and drug proceeds, the installation of false/hidden compartments ("traps") in those vehicles to covertly transport drugs and drug proceeds, the use of electronic wires, and the use of off-shore accounts to launder and conceal assets

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

9.      The property to be searched was seized during the arrest of Dewayne Allen MCGILL on April 6, 2023 near Exit 310 on I-75 North near Calhoun, Georgia. MCGILL was arrested on State of Georgia charges of Trafficking Methamphetamine, Possession of Methamphetamine, Possession of Methamphetamine with Intent to Distribute, and Felony Obstruction of Officers. A federal complaint (4:23-mj-20-WEJ) was signed on April 8, 2023, alleging violations of Title 18, United States Code, Sections 111 (Assault on a Federal Officer) and 924(c) (Possession of a Firearm During a Drug Trafficking Crime), as well as Title 21, United States Code, Section 841(a) and (b)(1)(B) (Possession with Intent to Distribute Methamphetamine).

10.      The property to be searched is described further in Attachment A, which is incorporated here:

a.  **SUBJECT DEVICE A:** One black AT&T Flip Phone (unknown phone number) seized on April 6, 2023 and currently located in the DEA Rome non-drug evidence vault (see inset photos to the right).



b.   **SUBJECT DEVICE B**: One black iPhone 11 with a black OTTER Box protective case (unknown phone number) seized on April 6, 2023 and currently located in the DEA Rome non-drug evidence vault (see inset photos to the right).



11.     Based on the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that presently concealed in **SUBJECT DEVICE A** and **SUBJECT DEVICE B** is information and data described in Attachment B, incorporated herein by reference, which may constitute evidence of a crime, contraband, fruits of crimes, or other items illegally possessed, or property designed for use, intended for use, or used in committing violations of Title 21, United States Code, Sections 841, 843(b), and 846, as well as 18 U.S.C. 924(c).

12.     The applied-for warrants would authorize the forensic examination of **SUBJECT DEVICE A** and **SUBJECT DEVICE B** for the purpose of identifying electronically-stored information and data particularly described in Attachment B. In my training and experience, I know that **SUBJECT DEVICE A** and **SUBJECT DEVICE B** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the devices first came into law enforcement possession.

13.     I previously obtained search warrants for **SUBJECT DEVICE A** (4:23-mc-31-WEJ) and **SUBJECT DEVICE B** (4:23-mc-32-WEJ) on April 18, 2023 from United States Magistrate Judge Walter E. Johnson of the United States District Court for the Northern District of Georgia. However, before executing those search warrants, I noticed errors (incorrect names) on the warrant documentation the government submitted to the Court. I therefore returned search warrants 4:23-mc-31-WEJ and 4:23-mc-32-WEJ to the Court unexecuted, and now apply for new search warrants based on the same probable cause.

## SOURCES OF INFORMATION CONTAINED HEREIN

14.     I make this affidavit based upon personal knowledge derived from my participation in this investigation, information I have learned from discussions with Special Agents and Task Force Officers of DEA, Calhoun Drug Task Force, and other law enforcement officers, and review of written reports.

15.     I have endeavored to make clear which facts stated in this Affidavit are based upon my own personal observations and which are not. Unless otherwise noted, factual statements not based upon my personal observations are based upon information received from one or more other law enforcement officers who may have either direct or hearsay knowledge of the factual statement, such knowledge having been conveyed to me either personally or through a report that

I have reviewed. Wherever in this Affidavit I state my belief, such belief is based upon my training and experience and upon the information obtained through this investigation.

16.     Because I am submitting this Affidavit for the limited purpose of demonstrating probable cause for the requested search warrants, I have not included each and every fact known about this investigation.

## PROBABLE CAUSE

17.     In early March 2023, agents with the DEA Rome POD North Georgia HIDTA Task Force, with assistance from the Calhoun Drug Task Force, began investigating the drug trafficking activities of Dewayne Allen McGILL.

18.     On March 9, 2023, a DEA confidential source (referred to hereinafter as "the CS"),[1] followed agents' direction and set up a deal to purchase approximately two ounces of methamphetamine from McGILL the next day. On the afternoon of March 10, 2023, the CS met with agents where they searched the

_____

[1] The confidential source has been cooperating with agents in the Rome POD since September 2022. The CS is cooperating with law enforcement in exchange for consideration regarding state drug charges. He/she has a criminal history that includes possession of controlled substances, possession of a controlled substance with intent to distribute, drugs not in original container, driving with a suspended license, and theft by shoplifting. Agents recently stopped using the CS due to his/her continued use of fentanyl (per their own admission) against the instructions of agents. Despite this, the CS has provided reliable information during his/her cooperation in this matter, which Rome POD agents have corroborated.

CS and his/her vehicle for controlled substances and gave him/her $350 in DEA Official Advanced Funds and covert audio/video surveillance equipment.

19.     The CS travelled to McGILL's residence at 109 Jeep Street, apartment #3 in Calhoun, Georgia, where he/she met with McGILL and purchased methamphetamine from him. Upon completing the controlled purchase, the CS again met agents and gave them a clear plastic baggie with approximately two ounces of an opaque, crystalline substance that field tested positive for methamphetamine. The substance has been sent to the DEA Mid-Atlantic Regional Laboratory for analysis.

20.     I reviewed the covert audio/video surveillance footage from the controlled purchase and what I saw and/or heard in the surveillance footage was consistent with CS's account to agents. During my review of the footage, I could see **SUBJECT DEVICE A** and **SUBJECT DEVICE B** lying on the same table on which McGILL weighed out the methamphetamine he sold to the CS.

21.     On April 6, 2023, agents with the DEA Rome POD and the Calhoun Drug Task Force prepared to execute a federal search warrant (4:23-mc-23-WEJ) on McGILL's residence at 109 Jeep Street, Apartment 3 in Calhoun, Georgia. Agents surveilled McGILL driving his BMW from his residence to the Target retail store at 100 Perimeter Center Place in Atlanta, Georgia. McGILL went inside the

Target while continuously using his cellular device (believed to be either **SUBJECT DEVICE A** or **SUBJECT DEVICE B**) and met with an unidentified black male. Both men walked out of the store and got into a white box truck. While in the box truck, agents watched MCGILL put what appeared to be a baggie containing a white substance, into a white, plastic Target shopping bag. McGILL got out of the truck, back into his own vehicle, and began driving back north on I-75 towards Calhoun. Agents were unable to continue surveillance due to the high volume of traffic and McGILL's counter surveillance maneuvers.

22.     At approximately 8:10 p.m. that night, Calhoun PD patrol and K-9 units located McGILL's BMW travelling north on I-75 in Gordon County (in the Northern District of Georgia). Based on what agents had seen earlier in the Target parking lot, officers conducted a traffic stop on northbound I-75 just north of Exit 310. Officers asked MCGILL and his female passenger to step out of the vehicle and instructed them to wait with officers while Calhoun PD K-9 Officer Jeremy Thompson used his K-9 to conduct a free-air sniff around McGILL's vehicle. The K-9, who is trained to detect the odors of various drugs, alerted to the vehicle. Officer Thompson returned the K-9 to his vehicle and advised McGILL that his K-

9 positively alerted for the odor of narcotics inside the vehicle and agents were going to search it.

23.     Agents and officers searched McGILL's BMW and seized over 300 grams of a substance that field tested positive as methamphetamine, as well as **SUBJECT DEVICE A** and **SUBJECT DEVICE B**. The substance has been sent to the DEA Mid-Atlantic Regional Laboratory for analysis.

24.     Based on my training, knowledge, and experience, I know drug traffickers often use multiple phones at a time to attempt to insulate themselves from law enforcement.  Drug traffickers also commonly use one phone to talk to their customers and will oftentimes have a separate phone they communicate with their source of supply.

## TECHNICAL TERMS

25.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling

communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include

various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such

navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have

static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

26.  Based on my training, experience, and research, I know that **SUBJECT DEVICE A** and **SUBJECT DEVICE B** have capabilities that allow each of them to serve as a wireless communication device, digital camera, portable media player, and GPS navigation device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

28.   *Forensic evidence.*   As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrants, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

> g.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).
>
> h.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.
>
> i.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

j.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

k.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit the examination of the devices consistent with the warrants.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrants.

30.     *Manner of execution.*  Because these warrants seek only permission to examine devices already in law enforcement's possession, the execution of these warrants does not involve the physical intrusion onto a premises.  Consequently, I submit there is good cause for the Court to authorize execution of the warrants at any time in the day or night.

## CONCLUSION

31.     I submit that this affidavit supports probable cause for search warrants authorizing the examination of **SUBJECT DEVICE A** and **SUBJECT DEVICE B** (described in Attachment A) to seek the items described in Attachment B.

# ATTACHMENT A

a. **SUBJECT DEVICE A:** One black AT&T Flip Phone (unknown phone number) seized on April 6, 2023 and currently located in the DEA Rome non-drug evidence vault (see inset photos below).



b. **SUBJECT DEVICE B**: One black iPhone 11 with a black OTTER Box protective case (unknown phone number) seized on April 6, 2023 and currently located in the DEA Rome non-drug evidence vault (see inset photos below).



# ATTACHMENT B

1.      All records and information on **SUBJECT DEVICE A** and **SUBJECT DEVICE B** (described in Attachment A) from January 1, 2023 to April 7, 2023 that relate to violations of 21 U.S.C. §§ 841, 843(b), and 846, as well as 18 U.S.C. 924(c), including, but not limited to:

    a.  Contact information to include names, addresses, telephone numbers, email addresses, or other identifiers;

    b.  Call log information, including missed, incoming, and outgoing calls and any information associated with those numbers;

    c.  Photographs, video and audio files that show the transportation, ordering, distribution, possession and sale of controlled substances, the collection, transmission, or other use of drug proceeds, the possession/use of firearms, and/or the connection to known and as yet unidentified co-conspirators that evidence the transportation, ordering, distribution, possession and sale of controlled substances, the collection, transmission, or other use of drug proceeds, and/or the connection to known and as yet unidentified co-conspirators;

    d.  Text messages, email messages, chats, multimedia messages, messages through other installed applications or other electronic communications that evidence the transportation, ordering, distribution, possession and sale of controlled substances, the collection of drug proceeds, the possession/use of firearms, and/or the connection to known and as yet unidentified co-conspirators;

    e.  Any Global Positioning Satellite (GPS) entries, records of Internet Protocol Connections, and location entries to include cell tower and Wi-Fi entries;

    f.  Internet or browser entries or history;

    g.  System, data or configuration information contained within the device;

h.  Lists of customers and related identifying information;

i.  Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

j.  Information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

k.  Information recording MCGILL's schedule or travel;

l.  Bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned **SUBJECT DEVICE A** and **SUBJECT DEVICE B** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

For discovery and authentication purposes, DEA will maintain a forensic copy of searched subject devices.